# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WOODMERE ART MUSEUM, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | NO. 2:25-cv-04887 |
| v. | : | |
| | : | |
| DONALD J. TRUMP, in his official capacity as | : | |
| President of the United States; | : | |
| INSTITUTE OF MUSEUM AND LIBRARY | : | |
| SERVICES; KEITH SONDERLING, in his | : | |
| official capacity as Acting Director of the | : | |
| Institute of Museum and Library Services; | : | |
| U.S. OFFICE OF MANAGEMENT AND | : | |
| BUDGET; and RUSSELL T. VOUGHT, in | : | |
| his official capacity as Director of the Office of | : | |
| Management and Budget, | : | |
| | : | |
| Defendants. | : | |

## TEMPORARY RESTRAINING ORDER AND ORDER FOR HEARING ON MOTION FOR PRELIMINARY INJUNCTION

**AND NOW**, this ____ day of August 2025, upon consideration of the Motion for

Temporary Restraining Order and Preliminary Injunction of Plaintiff, Woodmere Art Museum,

Inc., ("Plaintiff" or "Woodmere"), and it appearing that: (1) Plaintiff has a reasonable probability

of eventual success on the merits; (2) Plaintiff will suffer immediate and irreparable injury not

compensable in damages unless injunctive relief is granted; (3) greater injury would result from a

refusal of the injunctive relief requested than would result from granting such relief; and (4) the

public interest would not be adversely affected by, indeed such interests would be advanced by,

granting the relief requested:

It is ORDERED that:

1.      Plaintiff's Motion for a Temporary Restraining Order is hereby GRANTED;

2.      Defendants, including without limitation any persons acting by, through, or for each of them, are enjoined from terminating or in any other way inhibiting Woodmere's access to the funds appropriated for the Save America's Treasures grant awarded to Woodmere;

3.      It is further ORDERED that a hearing on Plaintiff's Motion for a Preliminary Injunction shall be held on _____, 2025;

4.      It is ORDERED further that a schedule for expedited discovery with respect to issues to be determined at the hearing on the Motion for Preliminary Injunction shall be addressed in a Conference with the Court, which shall take place on August ___,2025 at _:_.m.;

5.      It is further ORDERED that counsel for Plaintiff shall file this Order forthwith in the Clerk's office and have it entered of record; and

6.      It is further ORDERED that a copy of this Order shall be served upon each Defendant on or before ___August, 2025.

Dated this ____day of August 2025 at __o'clock __.m.


_____
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

WOODMERE ART MUSEUM, INC.,           :       CIVIL ACTION
                                     :
                    Plaintiff,       :
                                     :       NO. 2:25-cv-04887
        v.                           :
                                     :
DONALD J. TRUMP, in his official capacity as   :
President of the United States;      :
INSTITUTE OF MUSEUM AND LIBRARY      :
SERVICES; KEITH SONDERLING, in his   :
official capacity as Acting Director of the    :
Institute of Museum and Library Services;      :
U.S. OFFICE OF MANAGEMENT AND        :
BUDGET; and RUSSELL T. VOUGHT, in    :
his official capacity as Director of the Office of :
Management and Budget,               :
                                     :
                    Defendants.      :

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff, Woodmere Art Museum, Inc. ("Woodmere"), after providing notice of its intent to Defendants, moves for issuance of a Temporary Restraining Order and Preliminary Injunction against Defendants, Donald J. Trump, in his official capacity as President of the United States; Institute of Museum and Library Services; Keith Sonderling, in his official capacity as Acting Director of the Institute of Museum and Library Services; U.S. Office of Management and Budget; and Russell T. Vought, in his official capacity as Director of the Office of Management and Budget. In support of its Motion, Woodmere submits the following:

1.  its Verified Complaint;

2.  the accompanying Exhibits and Declaration; and

3.  the accompanying Memorandum of Law.

Woodmere includes a proposed form of order with this Motion.

**WHEREFORE**, Plaintiff Woodmere respectfully requests that the Court grant its Motion for a Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

EASTBURN and GRAY, PC

*/s/ John P. McShea*
John P. McShea (Pa. I.D. No. 34562)
Ralph J. Kelly (Pa. I.D. No. 35468)
Donna Brennan-Scott (Pa. I.D. 89275)
60 East Court Street
Doylestown, PA 18901
(215) 345-7000
jmcshea3@eastburngray.com
rkelly@eastburngray.com
dscott@eastburngray.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Temporary Restraining Order and Preliminary Injunction was served to David Metcalf, Esquire, United States Attorney for the Eastern District of Pennsylvania, as local attorney for all defendants, *via electronic mail* at usapae.usattorney@usdoj.gov, on the 26th day of August 2025.

/s/ John P. McShea
John P. McShea
Eastburn and Gray, P.C.

*Attorney for Plaintiff*
*Woodmere Art Museum, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WOODMERE ART MUSEUM, INC., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 2:25-cv-04887 |
| v. | : | |
| DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; U.S. OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget, | : | |
| Defendants. | : | |

## PLAINTIFF WOODMERE ART MUSEUM'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, Woodmere Art Museum, Inc. ("Woodmere"), submits this Memorandum of Law in Support of its Motion for Preliminary Injunction against defendants, Donald J. Trump, in his official capacity as President of the United States; Institute of Museum and Library Services ("IMLS"); Keith E. Sonderling, in his official capacity as Acting Director of the Institute of Museum and Library Services; U.S. Office of Management and Budget ("OMB"); and Russell T. Vought, in his official capacity as Director of the OMB.

## I.    **INTRODUCTION**

This case concerns violations of the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.,* and constitutional separation of powers, and the Appropriations and Take Care Clauses of the Constitution, resulting from Executive Order No. 14,238,[1] that directed IMLS, the federal agency dedicated to administering federal funds appropriated by Congress for museums, to terminate Woodmere's "Save America's Treasures" grant, funds appropriated by Congress in 2024 to support "nationally significant" cultural institutions. Woodmere relied upon its SAT grant both to raise an equal amount of matching funds and to enter to contracts to complete a project intended to exhibit its collection that of "America's Treasures" in time for the "America 250" celebration.

Woodmere alleges that, by implementing the Reduction EO, the Defendants have acted unlawfully by refusing to disburse funds appropriated by Congress. Defendants' actions were arbitrary and random – terminating Woodmere's grant with no reasoned explanation, yet reinstating two other local museums' terminated Save America's Treasures grants purportedly on grounds that should favor reinstating Woodmere's grant.

Woodmere asks this Court to enjoin further implementation of the Reduction EO and for declaratory relief concerning the illegal effect of the Reduction EO on Woodmere's SAT grant. Woodmere requests that the Court declare that Defendants' termination of Woodmere's grant was arbitrary and capricious in violation of the Administrative Procedures Act, and that their refusal to disburse funds appropriated by Congress violates the Constitution's separation of powers, which assigns Congress the power of the purse, the Appropriations Clause, which grants Congress

---

[1] The White House *Continuing the Reduction of the Federal Bureaucracy,* § 2(a) (Mar. 14, 2025) ("Reduction EO").

exclusive power over federal spending, and the Take Care Clause, which entrusts the President

with the responsibility to faithfully carry out the laws Congress enacted.

## II.    **FACTUAL BACKGROUND**

The IMLS is the primary federal agency responsible for supporting the country's museums

and libraries through grantmaking, research, and policy development. Although funding for IMLS

only constitutes 0.0046% of the federal budget, IMLS provides critical resources to libraries and

museums across the United States.    See Verified Complaint ("Compl.") at ¶ 18.    Congress

established IMLS in the Museum and Library Services Act of 1996 ("MLSA").  Pub. L. 104-208,

110 Stat. 3009 (1996).  It has reauthorized and extended the Institute three times since then – most

recently in a law signed by President Donald J. Trump in 2018. *See* Museum and Library Services

Act of 2018, Pub. L. 115-410, 132 Stat. 5412 (2018) (codified at 20 U.S.C. §§ 9101 *et seq.*).  The

current reauthorization of the Institute extends through September 30, 2025.   Compl. at ¶ 19.

By statute, IMLS is required to have both an Office of Museum Services and an Office of

Library Services. 20 U.S.C. § 9102.  It is required to engage in regular research and data collection

to "extend and improve the Nation's museum, library, and information services." *Id.* § 9108.  It is

charged with supporting museums and libraries across the States by disbursing and expending

appropriated funds and providing other forms of assistance. *Id.* §§ 9121-9165 (libraries), 9171-

9176 (museums). Compl. at ¶ 20.  IMLS also administers a variety of competitive grant programs

for libraries and museums, including the "Save America's Treasures" grants, which support

"nationally significant historic" projects involving art collections (including artifacts, museum

collections, documents, sculptures, and other works of art).[2] *Id.* at ¶ 21.

---

[2] Institute of Museum and Library Services, Grant Programs, https://www.imls.gov/find-funding-opportunities/grant-programs (last visited August 18, 2025).

Congress appropriated IMLS $294.8 million for Fiscal Year 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(5); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 div. D (2024). Compl. at ¶ 22. As of March 14, 2025, before implementation of the Executive Order, IMLS had a staff of 77. *Id.* at ¶ 23. However, the Executive Order, without providing any evidence, and contrary to the will of Congress as expressed in the MLSA, asserts that the IMLS is "unnecessary." Reduction EO § 1. Compl. at ¶ 23.

Save America's Treasures is a Historic Preservation Fund competitive grant program administered by the National Park Service in partnership with the Institute of Museum and Library Services ("IMLS") and other federal agencies. Id. at ¶ 1. Established in 1998 to celebrate America's premier cultural resources, Save America's Treasure ("SAT") grants recognize historic properties and collections that convey our nation's rich heritage to future generations. *Id.*

In 2023, Woodmere applied for a SAT grant, and made the case that its collection, ranging from the 18th Century to today, and comprising 10,000 works dedicated to telling the story of Philadelphia's art and artists from generation to generation, was a collection of national significance. *Id.* at ¶ 24. Woodmere emphasized in its grant application its focus on Philadelphia artists, including works from the Revolutionary-era artists (Benjamin West, Gilbert Stuart (including several portraits of George Washington)), an extensive collection of landscapes (many documenting America's westward expansion and the newly formed National Parks), the preeminent version of Hiram Powers' *America* (a famous vision of America as a pure ideal worthy of veneration and protection from secession), and a bust of Abraham Lincoln sculpted from life by Sarah Fisher Ames. *Id.*

Woodmere applied for a SAT grant to fund a project that ultimately would remind visitors to Woodmere of America's extraordinary heritage by displaying and making accessible its collection in a manner that will reflect the richness of American history. The project specifications and work details necessary to achieve the project's goals include ways to establish and configure new storage spaces to relieve collection overcrowding as well as implement updated storage practices. The project supported by the SAT grant would also make it possible for staff to update Woodmere's cataloguing system and move, catalogue, and digitize works in the collection. Woodmere planned to showcase its collection of works by Philadelphia artists for use in future exhibitions, most immediately its "America 250" celebration to be titled "the Arc of Promise," beginning in 2026. *Id.* at ¶ 25.

On September 10, 2024, the IMLS notified Woodmere that it been selected to receive an SAT award from the IMLS. Among the comments from the grant application reviewers were these statements: "Woodmere Art Museum's Collection reflect a rich history of Philadelphia from its early moments as the Nation's first capital until now," and "it stands to reason that [Woodmere] would house many significant works representing critical events in our nation's history." *Id.* at ¶ 26. The IMLS awarded Woodmere $750,000 – the most that could be awarded for a single SAT grant - that, once matched by private funds, enabled Woodmere to sign contracts for art conservation projects, many with local craftspeople – often independent contractors who have small businesses or are self-employed. *Id.* at ¶ 27.

SAT grants are reimbursed quarterly, and by December 2024, Woodmere had incurred $16,416 in grant expenditures that IMLS reimbursed on March 24, 2025. Since then, in reliance upon that grant reimbursement, and others it expected to receive, Woodmere has entered into more contracts to complete the project. To date, Woodmere has received IMSL reimbursement of

$195,002 for expenses incurred on the project from October 1, 2024 through May 9, 2025. *Id.* at ¶ 28.

But on March 14, 2025, the President issued the Reduction EO directing the IMLS to eliminate every one of its programs not mandated by statute, and to reduce its statutorily mandated functions and associated staff to the minimum required by law. The President also ordered the Office of Management and Budget to deny IMLS authorization to spend federal funds for any functions beyond the minimum required by statute. *Id.* § 2(c). Compl. at ¶ 3. The same day, the Senate passed and the President signed a continuing resolution for fiscal year 2025, which provides funding for IMLS through September 30, 2025. President Trump has directed the agency's elimination all on the same day. *Id.* at ¶ 4. Two weeks later, the President issued another Executive Order, evidently intended to encourage museums to "remind Americans of our extraordinary heritage,"[3] one of the objectives of Woodmere's grant-supported project.

The Reduction Executive Order, without providing any reasoned explanation, and contrary to the will of Congress as expressed in the MLSA, asserts that the IMLS is "unnecessary." Reduction EO § 1. Compl. ¶29. The EO directs IMLS and other covered agencies to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." Reduction EO § 2(a). Compl. ¶ 29. On March 31, 2025, the Director of Human Resources for IMLS informed agency staff that the entirety of IMLS would be placed on leave and that all grants would be terminated. The Director advised that staff should expect a reduction in force within 30 days. *See State of Rhode Island v. Trump*, No. 1:25-cv-128 JJM-LDA, 2025 WL1303868, at *3 (D.R.I. May 6, 2025). As observed by the *Rhode Island* court, the agency

---

[3] Exec. Order 14253, the White House *Restoring Truth and Sanity to American History*, § 1 (Mar. 27, 2025).

informed its employees that the agency would be stripped "down to the studs." *Id.* at *3. Comp. ¶ 30.

Upon information and belief, as of April 1, 2025, IMLS recalled a skeleton crew of approximately 12 staff members, including one deputy director for museums, and one program director for museums. *Id.* at ¶ 31. Because the remainder of IMLS staff have been placed on administrative leave, IMLS is not capable of servicing existing grants, and it has begun terminating existing grants, such as Woodmere's. *Id.* at ¶ 32. To ensure its implementation, the Reduction EO directs the Office of Management and Budget (OMB) and its Director, Russell Vought, to "reject funding requests" by the IMLS "to the extent they are inconsistent with this order." Reduction EO § 2(c); Compl. at ¶ 33. OMB's oversight of the decisions resulting from the Executive Order precludes the possibility the agency will make up for its dramatic cuts with increases elsewhere and makes it certain that the Administration will fail to spend the full amount of funding appropriated by Congress. *Id.* at ¶ 34. OMB's involvement also underscores that the purpose of the agency's planned reduction in force is to "[e]liminat[e] non-statutorily mandated functions," as Director Vought previously ordered in his February 26, 2025 Memorandum to Heads of Executive Departments and Agencies [Memo. at 3], and as the Executive Order now commands. Reduction EO § 2(a). Compl. at ¶ 35.

On April 8, 2025, the Acting Director of the IMLS notified Woodmere that its Save America's Treasures grant "is unfortunately no longer consistent with the agency's priorities and no longer serves the interests of the United States and the IMLS Program," adding that the grant was being terminated "in its entirety" effective immediately. Compl. at ¶ 6. The termination of Woodmere's Save America's Treasure grant by defendant Sonderling abruptly interrupted Woodmere's efforts to carry out its grant project, part of which was intended to support

its America 250 exhibition in 2026. Compl. at ¶ 36. The termination of Woodmere's SAT grant by defendant Sonderling abruptly interrupted Woodmere's grant project, part of which was intended to support its "America 250" exhibition in 2026. Id. at ¶ 37.

On May 8, 2025, Woodmere requested that defendant Sonderling review the termination of its Save America's Treasure grant. Woodmere's request has gone unanswered, yet it has become aware that at least two other Philadelphia-based museums that received such grants, the Atwater Kent Museum (now owned by Drexel University) and Historic Germantown, have had their grants restored by the IMLS with no known explanation.[4] Compl. at ¶ 47.

Woodmere is relying upon its Save America's Treasures grant to carry out a project to stabilize and conserve works in their collection by Philadelphia artists. Compl. at ¶ 39. Woodmere's project ultimately would remind visitors to Woodmere of America's extraordinary heritage by displaying and making accessible its collection in a manner that will reflect the richness of American history. Id.

Woodmere planned to use the SAT grant to showcase its collection of Philadelphia artists for use in future exhibitions, most immediately the "America 250" celebration beginning in 2026. Id. at ¶ 40. As the Cradle of Liberty, Philadelphia will attract countless visitors to celebrate America's Semi-quincentennial. Woodmere's grant is critical to its ability to complete and share its "Arc of Promise" collection next year with visitors from across the country and around the world the story of artists living and working in America's birthplace during the America 250 celebration next year. Id. at ¶ 41.

---

[4] Woodmere maintains that to be even handed all grants awarded to local recipients that IMLS terminated should be restored.

To make full use of its Save America's Treasures grant, Woodmere was required to raise funds to match all funds it anticipated receiving from the IMLS. In reliance upon receiving the grant, therefore, Woodmere solicited and raised an additional $750,000 from private donors who made their donations with the expectation that Woodmere would receive all of its grant money. *Id.* at ¶ 42. In significant reliance upon receiving its SAT grant, Woodmere entered into more contracts with local craftspeople to achieve completion of its collection conservation project in time for, among other exhibitions, the "America 250" celebration in 2026. *Id.* at ¶ 43. By the time Woodmere received the notification of its grant termination, Woodmere had entered into numerous contracts to ensure that it would achieve its project goals and make full use of the grant proceeds by September 30, 2026, when the grant was to be expire by its terms. *Id.* at ¶ 44. But with the imminent possible elimination of IMLS by September 30, 2025, Woodmere will need to maximize its SAT grant funds by September 30, 2025. *Id.*

Although Woodmere anticipated that change might be coming to IMLS as a result of the Reduction EO, it did not expect those changes would affect Woodmere's grant. Rather, it thought those changes might have an impact on *future* grants, *not* a grant that Woodmere had applied for in the past, a grant that it was awarded, and a grant it relied upon to solicit matching contributions and relied upon to enter into contracts to fulfill the project. The IMLS's letter caught Woodmere in midair, and it has been scrambling ever since to keep our SAT project alive. *Id.* at ¶ 45. Therefore, on May 8, 2025, Woodmere's Director and CEO, William Valerio, wrote to Mr. Sonderling, the Acting Director of the IMLS, and requested that he review and reconsider Woodmere's SAT grant termination. Woodmere has not received a response to this request, as well as follow up requests. *Id.* at ¶ 46.

Woodmere is aware that other Philadelphia area museums, similar to Woodmere, have had their previously terminated SAT grants restored, with no apparent reason why they received favorable treatment and Woodmere has not. IMLS's decision to rescind its prior termination of those two grants is because, as reported in the Philadelphia *Inquirer*, the IMLS "determined that [their] grant is consistent with the agency's priorities in furtherance of the President's agenda."[5] While that statement may be accurate, it cannot be reconciled with IMLS's decision to terminate Woodmere's grant because its "nationally significant" collection of "America's Treasures" is *also* consistent with the President's agenda, namely, to promote America's heritage. *Id.* at ¶ 47. Therefore, believing that Woodmere might be next to be informed its SAT grant was reinstated - in part because the IMLS had recognized that Woodmere's collection reflected ideals that were consistent with the President's desire to encourage collections that exemplified America's extraordinary heritage - since May, Woodmere has made discreet inquiries with government officials to determine whether and when Woodmere may receive the good news that it, too, will have its SAT grant restored. *Id.* at ¶ 48.

Woodmere has explored all reasonable, non-litigious means to have its grant restored. But at this point, with the grant project in jeopardy due to the pause in its funds, the expiration of the grant funding on September 30, 2025, and a serious need to complete its project in time to exhibit its nationally significant collection in time for the America 250 celebration, Woodmere has no choice but to take this action seeking relief for actions by Defendants that it believes to be unlawful. *Id.* at ¶ 49. The combined effect of the IMLS's termination of Woodmere's grant, the OMB's directive to reject further funding requests, the imminent elimination of IMLS on September 30, 2025, the failure of IMLS to respond to Woodmere's request for reconsideration of its grant

---

[5] https://www.inquirer.com/news/philadelphia/grants-funding-philadelphia-doge-cuts-trump-agenda-20250502.html?query=IMLS

termination, and the arbitrary and irrational refusal to reinstate Woodmere's grant while reinstating grants for similarly situated local museums, despite its intention to use its SAT grant in furtherance of the President's agenda, presents an imminent threat that Woodmere will suffer irreparable harm. *Id.* at ¶ 50.

## III.     ARGUMENT

### A.     Standard for Preliminary Injunctions

"A request for preliminary injunction is a request for extraordinary relief." *Ireland v. Hegseth,* 722 F. Supp. 3d 560, 564 (D. N.J. 2025); *see also Rhode Island v. Trump*, No. 1:25-cv-128-JJM-LDA, 2025 WL1303869 at *4 (D.R.I. May 6, 2025). Granting an injunction is "a matter of equitable discretion" that requires "the balance of equities." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365 (2008). Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). "[T]he President's actions may ... be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

"In determining whether to grant a preliminary injunction, a court must consider whether the party seeking the injunction has satisfied four factors: (1) likelihood of success on the merits; (2) he or she will suffer irreparable harm is the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017): *Doe 1, et al. v. Perkiomen Valley School*, 585 F.Supp.3d 668, 684 (E.D. Pa. 2022); *Ireland v. Hegseth,* 772 F. Supp. 3d 560, 564 (D. N.J. 2025)(internal quotations and citations omitted). "A district court – in its sound discretion - should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Reilly*, 858 F.3d at 176 (noting that the first two factors – the likelihood of success

on the merits and irreparable harm - are the "gateway" factors). *See Nken v. Holder*, 556 U.S. 481, 434, 129 S.Ct. 1749, 1749 (2009)(noting that, when evaluating whether interim relief is appropriate "[t]he first two factors of the traditional standard [of review] are the most critical"). Thus, the "district court has full discretion to balance the four factors once gateway thresholds are met." *Reilly*, 858 F.3d at 178 (citing *Nken* and *Winter*). *See also Doe 1*, 585 F.Supp.3d at 684 (noting that the Third Circuit "applies the 'sliding scale' approach").

The Third Circuit does "not require at the preliminary stage a more-likely-than-not showing of success on the merit because a 'likelihood [of success on the merits] does not mean more likely than not." *Reilly*, 858 F.3d at 179 fn. 3 (citations omitted). At this stage, plaintiff need only show "a reasonable probability of eventual success" or a "reasonable chance of success on the merits and irreparable harm to the movant." *Id.*[6]

Here, plaintiff Woodmere satisfies the requirements necessary for preliminary injunctive relief because: (1) Woodmere is likely to prevail on the merits of its claims against defendants; (2) an injunction is necessary to prevent irreparable harm that cannot be adequately compensated by damages if the Reduction EO is implemented and Woodmere's Save America's Treasures grant is not reinstated by September 30, 2025, when, according to the continuing resolution for fiscal year 2025, the President has directed IMLS to be eliminated; (3) the balance of the equities favor entering the preliminary injunction against defendants as Woodmere will suffer greater injury from the refusal to grant an injunction than by granting it, and the issuance of an injunction will not substantially harm defendants; and (4) preventing unconstitutional and unlawful agency actions as to the Save America's Treasures grant awarded to Woodmere is in the public interest.

---

[6] See Rhode Island at *4 (In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a court must keep in mind that the merits need not be 'conclusively determine[d];' instead, at this stage, decisions "are to be understood as statements of probable outcomes only.")

**B.    Woodmere is Likely to Succeed on the Merits of Its Claims against Defendants**

**1.    Defendant IMLS' Actions Violate the Administrative Procedure Act and are Arbitrary, Capricious, and an Abuse of Discretion**

IMLS' actions violate the Administrative Procedure Act ("APA") and are arbitrary, capricious and an abuse of discretion.   Defendant IMLS is an "agency" under the Administrative Procedure Act (APA). 5 U.S.C. §§ 551(1), 701.   Defendant IMLS took final agency actions that are subject to judicial review when it made decisions to implement the Reduction EO and substantially curtail its operations.

The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2).   An agency action is arbitrary or capricious where the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).   When an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 30, 33 (2020).   A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).   An action is also arbitrary and capricious if the agency "failed to consider ... important aspect[s] of the problem" before it or did not take into account "legitimate reliance interests." *Regents*, 591 U.S. at 25 (quoting *State Farm*, 463 U.S. at 43).

Here, defendant IMLS provided no reasoned explanation for its decision to dismantle the IMLS and terminate Woodmere's Save America's Treasures grant. Just months after awarding Woodmere's SAT grant after determining that Woodmere's collection was "nationally significant," IMLS, through its interim director, Mr. Sonderling, who had only been in his position no more than three months, stated that "Upon further review, IMLS has determined that your grant is unfortunately no longer consistent with the agency's priorities and no longer serves the interests of the United States and the IMLS Program." *See* Declaration of William Valerio, Exhibit 1 to Verified Complaint, at Exhibit C.  Mr. Sonderling's letter does not explain 1) what "review" IMLS undertook to reverse the opposite decision it made in September 2024, 2) why Woodmere's "nationally significant" collection, that the IMLS has acknowledged reflects America's heritage, "no longer serves the interests of the United States," or was *inconsistent* with the agency's priorities, especially in light of the President's Executive Order 14253, issued on March 27, 2025, that urges museums to "remind Americans of our extraordinary heritage," 3) what criteria it used to make this determination, and 4) what the "agency's priorities" are and why Woodmere's collection varies from those priorities.

Similarly, defendant IMLS provided no reasoned explanation for its decision to ignore Woodmere's request that IMLS reinstate Woodmere's Save America's Treasures grant while deciding, again with no known explanation, to restore SAT grants to two other local museums, the Atwater Kent Museum and Historic Germantown, that it had terminated. The randomness of those decisions, according to one published report of IMLS's decision to reinstate these two similar grants, is based on a determination that these two museum's collections are "consistent with the agency's priorities in furtherance of the President's agenda."[7] There is no logical way to reconcile

---

[7] See https://www.inquirer.com/news/philadelphia/grants-funding-philadelphia-doge-cuts-trump-agenda-20250502.html?query=IMLS

the IMLS's decision to reinstate the two, while leaving Woodmere's grant terminated. One court has characterized the IMLS's explanations for its positions as "boilerplate" and "anemic." *See Rhode Island v. Trump*, No. 1:25-cv-128-JJM-LDA, 2025 WL1303869 at *3 and 10. But more to the point, as observed by the *Rhode Island* court, "conclusory statements do not 'reasonably' explain agency action." *Rhode Island* at *11.

Defendant IMLS also failed to consider the legitimate reliance interests of grantees (such as Woodmere), the public, and other interested entities on the functions, programs, and offices that have been reduced or eliminated. *See Rhode Island* at *11. Defendant IMLS failed to consider reasonable alternatives to the elimination or reduction of its functions, programs, and offices. Defendant IMLS failed to weigh the purported benefits of eliminating its functions and programs against the costs. *Id.* Here, Woodmere has supplied evidence that in significant reliance on being awarded its SAT grant, it raised $750,000 from private donors who expect Woodmere to use its grant to complete its project, and entered into numerous contracts to fulfill its plans to conserve its collection to exhibit during the 2026 America 250 celebration. *See* Valerio Declaration, Ex. A to Verified Complaint, at ¶¶ 9, 10, 18, 19. Further, a pause in Woodmere's funding would delay completion of its project, resulting in Woodmere losing access to capital and its ability to fulfill contractual obligations it has with many contractors it engaged to perform conservation efforts, possibly leading to the loss of jobs if it has to halt further work on is project.

The IMLS' decision to terminate its grants on its face reflects an arbitrary and capricious action by failing to engage in reasoned analysis, assess alternatives, consider reliance, or do anything but eliminate its discretionary programs and minimize its remaining operations in blind adherence to the Executive Order. The "APA requires a rational connection between the facts, the

agency's rationale, and the ultimate decision." *Rhode Island* at *11 (citations omitted). Here, as in the *Rhode Island* case, that also involved a challenge to the IMLS's actions, "the 'rational connections' are absent." *Id.* Therefore, because there is a likelihood that Woodmere will succeed on the merits of its claims pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Woodmere is entitled to a declaration that the IMLS's decision to implement the Executive Order violates the APA. Woodmere is also entitled to vacatur of the IMLS' implementation of the Executive Order, specifically its termination of Woodmere's Save America's Treasures grant, and a preliminary and permanent injunction preventing defendants IMLS and OMB from enforcing or further implementing the Executive Order.

### 2. Defendants Sonderling's and IMLS' Actions Violate the Administrative Procedure Act, § 706

Defendant Sonderling and IMLS actions violate the APA because they are "not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA, a court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706 (1). The Museum and Library Services Act imposes mandatory duties on the Director of IMLS to disburse various grants. Additionally, Congress appropriated funds for IMLS to expend for this purpose. *See* Appropriations Act, 138 Stat. at 697; 2025 Appropriations Act, 139 Stat. at 10-12. Defendants IMLS and Sonderling, therefore, have non-discretionary duties to issue grants and to disburse funds appropriated for that purpose. Thus, there is a likelihood that Woodmere will succeed on the merits of its claim that IMLS and Sonderling violated the APA, and the Court should compel defendant IMLS to issue the grants it is statutorily required to issue and to disburse the funds Congress appropriated for that purpose.

### 3. Defendants' Actions Violate the Appropriations Clause

Defendants' unilateral executive actions are unconstitutional. The Constitution's Appropriation Clause grants "Congress 'exclusive power' over federal spending." *Nat'l Council of Nonprofits v. Off. Of Mgmt. & Budget,* No. 25-239 (LLA), 2025 WL 368852 at *12 (D.D.C. Feb. 3, 2025)(quoting *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.,* 665 F.3d 1339, 1346 (D.C. Cir. 2012).   Specifically, the Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law". U.S. Const. Art. I, § 9, cl. 7. The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 424 (1990)(quoting *Cincinnati Soap Co. v. United States,* 301 U.S. 308, 321 (1937)).   Without such exclusive power, "the [E]xecutive would possess an unbounded power over the public purse of the nation[] and might apply all its monied resources at his pleasure." *U.S. Dep't of the Navy,* 665 F.3d at 1347 (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213-14 (1833).

Here, Congress has expressly directed that funds be expended for the operations of agencies that it has created. Defendants' unilateral executive action to decline to expend appropriated funds, therefore, infringes on Congress' appropriations power and is unconstitutional. Accordingly, the facts alleged in the Verified Complaint establish a reasonable probability of success on the merits and this Court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer,* 103 F. Supp. 569 (D.D.C. 1952), *aff'd,* 343 U.S. 579 (1952).

4.      **Defendants' Actions Violate Separation of Powers  Usurping Legislative Authority**

Defendants' unilateral executive actions violate the constitutional separation of powers. The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB,* 591 U.S. 197, 227 (2020); *see also Trump v. United States,* 603 U.S. 593, 637-38 (2024).   Article I of the United States Constitution grants to the legislative branch the exclusive power to make law and the power of the purse. Specifically, Article 1, Section 1 enumerates that: "[a]ll legislative Powers herein granted shall be vested in ... Congress." U.S. Const., Art. I, § 1.   The Constitution also "exclusively grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump,* 897 F.3d 1225, 1231 (9th Cir. 2018).   As for the Executive, the Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585 (1952).   The Executive has no power "to enact, to amend, or to repeal statutes. *Clinton v. City of New York,* 524 U.S. 417, 438 (1998).   Furthermore, "settled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates.   *In re Aiken County,* 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).   Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

Here, where Congress has created the IMLS and the programs it administers, the Executive cannot do away with the agency or effectively incapacitate its ability to administer appropriated grants or carry out statutorily assigned duties.   The unilateral actions described in Woodmere's Verified Complaint violate Constitutional and statutory mandates, contravene Congressional intent, and are unlawful.   Therefore, there is a reasonable probability that Woodmere will succeed

on the merits of its claims, and this Court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co.,* 103 F. Supp. at 576, *aff'd,* 343 U.S. 579.

### 5.    Defendants' Actions Violate the Take Care Clause

Defendants' unilateral actions violate the Take Care Clause.  Under the Constitution, the Take Care Clause requires that the President "take Care that the Laws be faithfully executed." U.S Const. Art. II, § 3; *Util. Air Reg. Grp. v. EPA,* 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President … faithfully executes them")(internal quotation marks and citation omitted).  The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union,* 190 F.3d 545, 551 (D.C. Cir. 1999)(holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States,* 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care Clause "implies a power to forbid their execution").

By dismantling the IMLS and the programs it administers, which are creatures of Congress, the Executive has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.  Therefore, there is a reasonable probability that Woodmere will succeed on the merits of its claim that Defendant President Trump violated the Take Clause and this Court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co.,* 103 F. Supp. at 576, *aff'd,* 343 U.S. 579.

C.    **Preliminary Injunctive Relief is Necessary to Prevent Irreparable Harm Which Cannot Adequately be Compensated by Damages**

District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief. *Doe I*, 585 F.Supp.3d at 699. *See Rhode Island* at *15 (citations omitted). "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial." *Doe 1* at 699.

In this case, unless the IMLS responds positively to Woodmere's request to have its grant termination reconsidered and its grant funds are restored by September 30, 2025, Woodmere's grant project will be irreparably harmed, meaning a monetary award will be inadequate, because the grant is integral to Woodmere's ability to complete its project, and the funds need to be accessible by September 30, 2025.  After that point, Woodmere's ability to complete its conservation project in time for the America 250 exhibition will be academic. The Save America's Treasures grant supports the care, preservation and storage of one of the country's great collections of American art, and without the ability to access these funds by September 30, Woodmere's "Arc of Promise" exhibition that it intended its grant to complete in time for the America 250 celebration (*see* Valerio Declaration at ¶ 20), faces elimination if the President's desire to eliminate IMLS by that date comes true.  Many works of art need immediate conservation and restoration to be displayed and the loss of the grant deals a devastating blow to Woodmere's ability to provide proper collection care and conservation of work to be displayed as part of the America 250 celebration exhibition in 2026.  In short, despite Woodmere being recognized as one of the country's great collections of American art – a determination *consistent with* the President's desire that museums exemplify America's rich heritage - the collection is in grave danger of becoming inaccessible to all those interested in America's national patrimony and Philadelphia's contribution

to the development of our nation, as well as to countless visitors to Philadelphia from across the country and around the world to celebrate America 250.

**D.    Preliminary Injunctive Relief is Proper Because the Balance of Equities and the Public Interest Favor Relief**

The final two preliminary injunction factors – balance of the equities and public interest – merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors also strongly favor preliminary injunctive relief in this case.  When weighing these factors, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief . . . pay[ing] particular regard for the public consequences" that would result from the emergency relief sought. *Rhode Island* at *17 (quoting *Winter*, 555 U.S. at 24).

First, the actions challenged herein are contrary to law and exceed defendants' authority. Neither the President nor an executive agency can take any action that exceeds the scope of their constitutional or statutory authority such as dismantling a federal agency and terminating an agency's programs by eliminating the staff and resources the agency requires to meet its statutory obligations.  As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted).  Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020). *League of Women Voters*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Plaintiff Woodmere has established a high likelihood that the defendants have violated both statutory and constitutional safeguards.  And, as detailed above and in its supporting Declaration

and exhibits, Woodmere has also established a high likelihood of irreparable harm resulting from the termination of its Save America's Treasures grant as a consequence – unintended or otherwise – of dismantling of an agency established by Congress. Thus, there is a weighty public interest in favor of granting relief to stop the enforcement of these unconstitutional and unlawful agency actions. *Saget v. Trump,* 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) (where "Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief.")(citing *Issa v. Sch. Distr. of Lancaster,* 847 F.3d 121, 143 (3d Cir. 2017)). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond the[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com Corp.,* 337 U.S. 682, 689 (1949).

Second, on the other side of the balancing scale, the defendants cannot demonstrate how the public interest would be harmed by restoring Woodmere's Save America's Treasures grant while the court determines whether such termination is legally permissible. Indeed, "[i]t is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Maine Forest Prods. Counsel v. Cormier,* 586 F. Supp. 3d 22, 64 (D. ME), aff'd 51 F. 4th 1 (1st Cir. 2022)(citation omitted). Moreover "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriquez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013).

## IV.    **CONCLUSION**

For the foregoing reasons, Woodmere satisfies the elements necessary for issuance of a preliminary injunctive relief against defendants, and respectfully requests that the Court grant

Woodmere's Motion for Temporary Restraining Order and Preliminary Injunction and issue an Order in the form proposed.

Respectfully submitted,

EASTBURN and GRAY, PC

/s/ John P. McShea
John P. McShea (Pa. I.D. No. 34562)
Ralph J. Kelly (Pa. I.D. No. 35468)
Donna Brennan-Scott (Pa. I.D. No. 89275)
60 East Court Street
Doylestown, PA 189019102
(215) 345-7000
jmcshea@eastburngray.com
rkelly@eastburngray.com
dscott@eastburngray.com

*Attorneys for Plaintiff*